IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

B.D.A.A.,                                           Civ. No. 6:25-cv-02062-AA

           Petitioner,                      **OPINION & ORDER**

      v.

DREW BOSTOCK, Seattle Field Office
Director, U.S. Immigration and Customs
Enforcement and Removal Operation;
KRISTI NOEM, Secretary of Homeland
Security; PAMELA BONDI, Attorney
General; TODD LYONS, Acting Director
of Immigration and Customs
Enforcement; U.S. DEPARTMENT
OF HOMELAND SECURITY;
U.S. IMMIGRATION AND CUSTOMS
ENFORCMENT; and U.S. DEPARTMENT
OF JUSTICE,

           Respondents.

_____

AIKEN, District Judge:

      This habeas case comes before the Court on an Amended Petition for

Writ of Habeas Corpus, ECF No. 2.  After reviewing the filings, the Court

determined that the petition could be decided as a matter of law and that an

evidentiary hearing was not required.  *See* 28 U.S.C. § 2243 ("Unless the

application for the writ and the return present only issues of law the person to

whom the writ is directed shall be required to produce at the hearing the body

Page 1 – OPINION & ORDER

of the person detained."); *see also Farquharson v. Landon*, 217 F.2d 603, 604 (9th Cir. 1954) (no requirement to produce additional testimony or bring the petitioner into court where "uncontroverted facts" were found in the record and "[no] other questions than the law to be applied remained"). For the reasons explained below, the Court GRANTS the petition for a writ of habeas corpus, ECF No. 2. Respondents are ordered to immediately release Petitioner from custody subject to the prior terms and conditions of her bona fide U.S. Citizenship and Immigration Services ("USCIS") U visa determination and the temporary work authorization that she was granted on January 15, 2024.

## BACKGROUND

Petitioner B.D.A.A. is a citizen of Mexico who has been living in the United States since 1992 without lawful status. Pet. Reply at 9, 22, ECF No. 20; Reddish Decl. ¶ 4, ECF No. 11; Luse Decl., Ex. 1, Notice to Appear ("NTA"), ECF No. 12-1. Petitioner is currently detained at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington, Reddish Decl. ¶ 9, subject to newly initiated removal proceedings, Luse Decl., Ex. 1, NTA.

Petitioner has a pending U visa application, Form I-918, and a pending application for advance permission to enter the United States as a nonimmigrant, Form I-192. Resp. at 2, ECF No. 10; Luse Decl., Ex. 3 (Bona Fide Determination Notice), ECF 12-3. On December 20, 2024, USCIS issued a bona fide determination notice "which means the U visa application cannot be approved at this time but is likely to be approved when a visa number

becomes available." *Id.* at 3 (citing Luse Decl., Ex. 3). On March 28, 2024, "Petitioner filed a Form I-765." Resp. at 4 (citing Luse Decl., Ex. 2 at 3, Application for Employment Authorization). On January 15, 2025, Petitioner was issued a temporary work authorization that expires on January 14, 2029. *Id.*

Petitioner attests that, on November 5, 2025, she was driving a motor vehicle on a public highway in Albany, Oregon when she was stopped by ICE officers. B.D.A.A. Decl. ¶¶ 2, 3, ECF No. 21. Petitioner attests that, at the time of the stop, she "wasn't speeding or violating any traffic laws," but that "when [she] heard the sirens, [she] had a bad feeling that this might be ICE," so she called her daughter Jennifer, who "started to cry and panic" and handed the phone to Petitioner's other daughter Emily. *Id.* at ¶¶ 2–3; Reply at 8. Petitioner attests that she could communicate with her daughter using the Bluetooth earbud she was wearing and that her "daughter could hear some of what the officer was saying to [her]." *Id.* at ¶ 4.

Petitioner attests that two officers approached her car and asked for identification and that she gave them her USCIS work authorization card. *Id.* at ¶¶ 5–7. Petitioner attests that when the Spanish-speaking officer asked for her keys, she gave them to that officer, and that when the other officer "tried to take off my seat belt and pull [her] arms to get [her] out of the car," she told them, "I'm not resisting, I will get out." *Id.* at ¶ 8. She attests that she was then put into a black car with tinted windows, *id.* at ¶ 9, and that "[she] asked

them if they had an arrest warrant," and that "they said no[,]" *id.* at ¶ 10. She attests that "[she] asked them why they had stopped [her]" and that "they said [it] was simply because they ran my license plate[,] and that's how they knew [her] name." *Id.* She also attests that the Spanish-speaking officer told her that she was stopped because it was "por tu mala suerte[,]" "which means 'for your bad luck[.]'" *Id.*

At some time during the stop, an ICE officer issued a Notice to Appear. *See* Luse Decl., Ex. 1, ECF No. 12-1. Petitioner was taken to the Portland ICE Detention Facility. *Id.* at ¶ 21. Petitioner's daughters tracked Petitioner's movements through tracking app on Petitioner's cell phone and alerted Petitioner's immigration attorney, Ms. Santos. Arellano de la Garza Decl. at ¶¶ 2–5, ECF No. 22; *see also* Arellano de la Garza Decl., Ex. 2 (tracking screenshots). Ms. Santos arrived soon afterward. Santos Decl. at ¶ 3, ECF No. 23. Both Petitioner and Ms. Santos attest that they were permitted to meet for only a "few minutes." B.D.A.A. Decl. ¶ 24; Santos Decl. ¶ 3. Petitioner attests that the meeting with Ms. Santos was interrupted because Petitioner was told that "[she] had to go with the officers," and that when she told them "that [her] lawyer was still waiting for [her]," *id.*, one of the officers responded, "'okay, give me a minute[,]'" *id.* at ¶ 25. Petitioner attests that she had the "expectation that [she] would continue to be able to talk to [her] lawyer." *Id.* But she was handcuffed and taken with officers, and when she again told them

that "[her] lawyer was waiting for [her]," they "ignored [her] and took [her] and put [her] in the car." *Id.* at ¶ 26.

Petitioner was driven across state lines to Washington. *Id.* at ¶ 27. She attests that "[she] was nervous and scared" because the car had stopped at a Washington rest stop and "[she] was alone with two male officers in the car." *Id.* at ¶ 28. One of the officers later informed her "that they had stopped because they were waiting for the bus that's going to take [her] to the detention center." *Id.* at ¶ 30. According to screenshots from the tracking app on Petitioner's phone, Petitioner was at the rest area for 1 hour and 15 minutes. Arellano de la Garza Decl., Ex. 2 at 9. Petitioner attests that when the bus arrived and she boarded, "[she] realized that the detainees that were on the bus were the same people who were with [her] in the Portland detention center," and that "[o]ne of the detainees asked [her] why [she] was not on the bus with them, and why [she] was separated." *Id.* at ¶ 33.

## LEGAL STANDARD

Under 28 U.S.C. § 2241, federal district courts "within their respective jurisdictions" have the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States." The "essence of habeas corpus is an attack by a person in custody upon the legality of that custody." *Prieser v, Rodriguez*, 411 U.S. 475, 484, 489 (1973). Habeas corpus "entitles [a] prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the

erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting, *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). Courts have statutory and inherent power to grant such petitions. *Ozturk v. Trump*, 779 F. Supp. 3d 462, 486–87 (D. Vt. 2025) (citing *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978)).

## DISCUSSION

Petitioner alleges that she was unlawfully arrested in violation of the Fourth and Fifth Amendments and the INA and that Respondents lack lawful grounds to detain her.  Pet. ¶¶ 19–20; Pet. Reply at 17–18.  Respondents maintain that this Court does not have jurisdiction because "Congress has barred district courts from reviewing claims of unlawful arrest that arise out of removal proceedings[,]" Resp. at 2, that "unlawful arrest is not an appropriate ground for habeas relief," *id.* at 2, and that "officers had probable cause to arrest Petitioner, [so] her Fourth Amendment unlawful arrest claim fails[,]" *id.* at 2–3.

I.    *The Court Has Jurisdiction*

Respondents maintain that 8 U.S.C. §§ 1252(g) and 1252(b)(9) strip this Court of jurisdiction to review B.D.A.A.'s habeas petition.  Resp. at 6.  Section 1252(g) provides that

> no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, *or execute removal orders* against any alien under this chapter.

8 U.S.C. § 1252(g) (emphasis added). Respondents commenced removal proceedings against Petitioner when they issued a Notice to Appear ("NTA"). Respondents maintain that section 1252(g) bars this Court "from questioning ICE's discretionary decisions to commence removal" and "detain [Petitioner] during [her] removal proceedings[.]" Resp. at 6 (quoting *Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1203 (11th Cir. 2016)).

Respondents also cite 8 U.S.C. 1252(b)(9), which provides that:

> [j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9). And judicial review of such a final order is available only through "a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5). Respondents contend that these provisions "divest district courts of jurisdiction to review both direct and indirect challenges to removal orders, including decisions to detain for purposes of removal proceedings." Resp. at 7–8.

The jurisdiction-stripping provisions of the INA do not apply here. Petitioner is not challenging the removal proceedings; she is challenging the legality of her detention. "By virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal." *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007). And "the binding authority dictates that treating everything related to and leading up to removal proceedings as 'arising from' a removal action is an incorrect

reading of the relevant statutes." *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 884 (C.D. Cal. 2025) (citing *Jennings v. Rodriguez*, 583 U.S. 281, 292–93, (2018), *U.S. Dep't of Homeland Sec. v. Regents of Univ. of California*, 591 U.S. 1, 19 (2020), *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 810 (9th Cir. 2020)).

The Supreme Court has interpreted § 1252(g)'s jurisdiction-stripping provision narrowly, limiting it to only "three discrete actions:" the "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*") (emphasis in original) (quoting 8 U.S.C. § 1252(g)). The Court rejected any reading of the statute that would cover "the universe of deportation claims," *id.*, and cautioned against interpreting § 1252(g) with "uncritical literalism" "to sweep in any claim that can technically be said to 'arise from' the three listed actions." *Jennings*, 583 U.S. at 293–94 (2018)).

"[T]he proper jurisdictional analysis under Section 1252(g) focuses on the government action or decision that gives rise to the plaintiff's claims, not whether the plaintiff's claims might affect or preclude removal." *Sepulveda Ayala v. Bondi¸* 794 F. Supp. 3d 901, 908 (W.D. Wash. 2025) (quoting *Arce v. United States*, 899 F.3d 796, 799–800 (9th Cir. 2018)). Detention decisions are not among the three discretionary acts rendered unreviewable by section 1252(g). *Ibarra-Perez v. United States*, 154 F.4th 989, 996 (9th Cir. 2025) ("[A]ssertions of illegal detention [are] plainly collateral to ICE's prosecutorial

decision to execute [a] removal."). And "§ 1252(g) does not prevent the district court from exercising jurisdiction over the plaintiffs' due process claims . . . because those due process claims [do] not arise from a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien,' but instead constitute general collateral challenges to unconstitutional practices and policies used by the agency." *Id.* (cleaned up) (quoting 8 U.S.C. 1252(g)).

Section 1252(b)(9), likewise, "does not bar claims that are 'independent of or collateral to the removal process[,]'" including challenges to the manner in which an individual is first arrested and detained. *Rodriguez v. Bostock*, No. 3:25-CV-05240-TMC, 2025 WL 2782499, at *9 (W.D. Wash. Sept. 30, 2025) (quoting *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016) and citing *Jennings*, 583 U.S. at 293). "The Supreme Court has . . . instructed that § 1252(b)(9) is a 'targeted' and 'narrow' provision that 'is certainly not a bar where . . . the parties are not challenging any removal proceedings.'" *Gonzalez*, 975 F.3d at 810 (quoting *U.S. Dep't of Homeland Sec. v. Regents*, 592 U.S. at 19).

Further, Respondents' broad interpretation of the INA's jurisdiction-stripping provisions raises serious Suspension Clause concerns. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "While Congress

may modify the right to seek the writ under certain circumstances, it may not do so without providing 'a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention.'" *Sepulveda*, 794 F. Supp. 3d at 908 (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)).

Here, Respondents' interpretation would leave Petitioner without a remedy to challenge the legality of her detention.  Other courts have raised similar concerns about the INA's jurisdiction-stripping provisions and the availability of habeas relief for ICE detainees.  *See Ozturk*, 779 F. Supp. 3d at 482–87 (considering whether Congress had provided ICE detainees with sufficient substitute remedy for habeas); *Mohammed H. v. Trump*, 786 F. Supp. 3d 1149, 1155 (D. Minn. 2025) ("The [jurisdiction stripping] statutes cannot be stretched so far that they entirely preclude any habeas jurisdiction over constitutional challenges to immigration detention.").  "Federal courts should decline to construe acts of Congress 'in a manner that could in turn call upon the Court to resolve difficult and sensitive [constitutional] questions[.]'" *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 772 (9th Cir. 1999) (quoting *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 507 (1979)).  The constitutional avoidance canon supports this Court's narrow interpretation of sections 1252(g) and 1252(b)(9). *Sepulveda*, 794 F. Supp. 3d at 908

In sum, the jurisdiction-stripping provisions of sections 1252(g) and 1252(b)(9) do not apply here because Petitioner does not challenge the removal

proceedings, she challenges the legality of her detention. The Court thus has jurisdiction to review Petitioner's habeas claims.

II.    *Bona Fide U Visa Determination*

In December 2024, Petitioner received a bona fide U visa determination. Luse Decl., Ex. 3, Bona Fide Determination Notice. U visas provides a path to legal status for a non-citizen victims of certain serious crimes who have "suffered substantial physical or mental abuse," who "possess[] information concerning [that] criminal activity," and who have helped law enforcement investigate or prosecute those crimes. 8 U.S.C. § 1101(a)(15)(U) (providing eligibility criteria); 8 C.F.R. § 214.14. Congress created the U-visa program in 2000 to encourage crime victims to report crimes and assist law enforcement without fear of removal. *Sepulveda Ayala v. Noem*, No. 3:25-CV-5185-JNW, 2025 WL 1616075, at *1 (W.D. Wash. June 5, 2025). U-visa applicants must show that they are admissible into the United States or that any ground for inadmissibility has been waived, 8 C.F.R. §§ 214.1(a)(3)(i), 214.14(c)(2)(iv). "Once issued a U visa, the petitioner receives lawful nonimmigrant status and work authorization for up to four years." *De Sousa v. Dir. of U.S. Citizenship & Immigr. Servs.*, 755 F. Supp. 3d 1266, 1268 (N.D. Cal. 2024) (citing 8 U.S.C. §§ 1184(p)(3)(B), (p)(6); 8 C.F.R. § 274a.12(a)(19)).

There is a statutory cap of 10,000 U visas that may be issued each year, "a figure routinely exceeded by the number of petitions filed." *Patel v. Noem*, 788 F. Supp. 3d 950, 953 (N.D. Ill. 2025) (citing 8 U.S.C. § 1184(p)(2)(A)).

Eligible petitioners who, due solely to the cap, are not granted U-1 nonimmigrant status are placed on a waitlist. *Id.* (citing 8 C.F.R § 214.14(d)(2)). "The wait time for issuance of a U visa is at least seven or eight years." *De Sousa*, 755 F. Supp. 3d at 1268.

"USCIS places petitioners who qualify for a U visa but who cannot obtain one due to the statutory cap on a waiting list, where they receive interim benefits[,] includ[ing] deferred action, which protects them against removal from the United States, as well as employment authorization." *Id.* "Priority on the waiting list [is] determined by the date the petition was filed with the oldest petitions receiving the highest priority." 8 C.F.R. § 214(d)(2). In 2021, USCIS implemented the Bona Fide Determination ("BFD") process, to contend with "drastic increases in the volume of U nonimmigrants petitions and a growing backlog awaiting placement on the waiting list or final adjudication." *Kothari v. Dir. of United States Citizenship & Immigr. Servs.*, No. 3:24 C 50101, 2025 WL 732075, at *3 (N.D. Ill. Jan. 24, 2025) (quoting U.S. Citizenship & Immigr. Servs., *Policy Alert* (June 14, 2021)). Under the BFD process, USCIS first considers whether an application was made in "good faith; without fraud or deceit," and then whether the applicant "poses a risk to national security or public safety [or] otherwise merits a favorable exercise of discretion." *Id.* (quoting USCIS *Policy Alert*). When the applicant overcomes the second hurdle, that applicant is issued an employment authorization document and is granted deferred action. *Id.*

III.    *Petitioner's Due Process Claim*

Petitioner asserts that her arrest and detention are unlawful because such actions violate her Fifth Amendment due process rights. The Due Process clause prohibits deprivations of life, liberty, and property without due process of law. U.S. Const. amend. V. The essence of [procedural] due process is that a person at risk of serious loss be given notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). These protections extend to noncitizens present in the United States. *See Trump v. J.G.G.*, 604 U.S. 670, (2025) (*per curiam*) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings.") (internal quotation marks and citation omitted); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty the [Due Process] Clause protects." *Zadvydas*, 533 U.S. 678, 687–688 (2001). "Even those who face significant constraints on their liberty or those over whose liberty the government wields significant discretion retain a protected interest in their liberty." *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *11 (D. Ariz. Aug. 11, 2025).

To determine whether the government has provided sufficient procedural due process to deprive an individual of life, liberty, or property, courts consider three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguard;" and (3) "the [g]overnment's interest, including . . . the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Ninth Circuit has "assume[d] without deciding" that *Mathews* applies in the immigration detention context. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022); *see also Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *3 n.2 (N.D. Cal. Jul. 24, 2025) (collecting cases where the Ninth Circuit has applied *Mathews* in the immigration context). Here, each of the *Mathews* factors favors Petitioner.

As to the first *Mathews* factor, the parties do not dispute that Petitioner received a bona fide determination of her U visa status and was notified that "[she] warrant[ed] a favorable exercise of discretion to receive employment authorization and deferred action." Luce Decl., Ex. 3. She was then granted a work authorization. Resp. at 4. Because a bona fide U visa determination confers deferred action and work authorization, Petitioner risks the loss of a substantial property interest. *Sepulveda*, 794 F. Supp. 3d at 908. Further, "deferred action is an immigration benefit that prevents removal," so

Petitioner also risks the loss of her liberty interest. *Ayala v. Bondi*, No. 2:25-cv-01063-JNW-TLF, 2025 WL 2209708, at *3 (W.D. Wash. Aug. 4, 2025).

In *AADC*, the Supreme Court described deferred action as meaning "no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated." *AADC*, 525 U.S. at 484. "This definition reflects the fundamental nature of deferred action, regardless of the specific program or context in which it is granted." *Ayala*, 2025 WL 2209708, at *3. "The Ninth Circuit and numerous district courts have consistently applied this understanding across different deferred action contexts, holding that deferred action prevents recipients' removal from the United States." *Id.* (citing *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1119 n.3 (9th Cir. 2001) (A deferred action means that the government agency "takes no action to proceed against an apparently deportable alien based on a prescribed set of factors generally related to humanitarian grounds."). *See Lee v. Holder*, 599 F.3d 973, 974–75 (9th Cir. 2010) (interim relief program providing deferred action to U visa applicants prevented their removal from the United States); *see also Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 800 (D. Ariz. 2015) (defining deferred action, generally, as "a form of prosecutorial discretion" by which the Secretary of Homeland Security "decide[s] not to pursue the removal of a person unlawfully in the United States"); *De Sousa*, 755 F. Supp. 3d at 1270 ("'Deferred action' refers to an 'exercise in administrative discretion' under which 'no action will thereafter be taken to proceed' with the applicant's

removal from the United States."); (*Bustos-Alonso v. Chestnut*, No. 1:25-CV-01570-DJC-AC, 2025 WL 3254621, at *4 (E.D. Cal. Nov. 21, 2025) (same). And even though "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), once a benefit has been conferred, it may not then be taken away without sufficient procedural due process, *Bell v. Burson*, 402 U.S. 535, 539 (1971). Petitioner thus risks losing her work authorization and deferred status, which confer substantial property interests. And the loss of Petitioner's deferred status also risks the loss of her liberty interest—a deprivation that cannot be remedied after the fact. Petitioner's property and liberty interests are great. The first *Mathews* factor strongly favors Petitioner.

As to the second *Mathews* factor, the risk of erroneous deprivation "through the procedures used" is great. The parties do not dispute that no procedures have been used. Petitioner has not been provided any pre-deprivation notice or hearing. Yet, Respondents' actions have nullified Petitioner's work authorization and deferred status, and she is detained and now subject to removal proceedings. *See F.R.P. v. Wamsley*, No. 3:25-CV-01917-AN, 2025 WL 3037858, at *4 (D. Or. Oct. 30, 2025) (finding a "serious risk of erroneous deprivation" where "there are serious questions as to whether [detained U visa holder] is removable at all"); *Maldonado v. Noem*, No. 4:25-CV-2541, 2025 WL 1593133, at *1 (S.D. Tex. June 5, 2025) (holding that ICE's attempt to remove Petitioner who had a bona fide U visa determination

"effectively nullif[ied] his deferred action" and violated his due process rights). Because Respondents provided no pre-deprivation notice or hearing or other procedure, the risk of erroneous deprivation is great. The second *Mathews* factor strongly favors Petitioner.

As to the third *Mathews* factor, the government's burden of providing sufficient (and lawful) procedures, including the burden of any administrative and financial costs, is not great. "The effort and cost required to provide Petitioner with procedural safeguards is minimal." *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1094 (E.D. Cal. 2025). To do otherwise incurs great financial burden. "The costs to the public of immigration detention are 'staggering.'" *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). "Supervised release programs cost much less by comparison." *Id.* The third *Mathews* factor also strongly favors Petitioner.

In sum, Respondents deprived Petitioner of her Fifth Amendment due process rights by detaining her without prior notice and hearing. Respondents thus nullified Petitioner's bona fide U visa determination and its attendant benefits, including Petitioner's work authorization and deferred action status without due process.

IV.   *Violation of INA Procedures*

Finally, Respondents contend that ICE officers effected a lawful arrest through proper INA procedures, Resp. at 12. But Petitioner's warrantless arrest was in fact improper because it violated the INA criteria for probable

cause to effect a warrantless arrest. *Ramirez Ovando v. Noem*, ___F. Supp.
3d.___, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *2 (D. Colo. Nov. 25,
2025). Under the INA, an immigration officer may make a warrantless arrest
only when that officer "has reason to believe" that the individual "is in the
United States in violation of [the immigration laws]" *and* "is likely to escape
before a warrant can be obtained for his arrest." *Id.* (emphasis added) (citing
8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii)). ICE officers must satisfy both
prongs to establish probable cause to effect a warrantless arrest. Setting aside
the likely Fourth Amendment violation, Respondents' contravention of INA
arrest procedures is an APA violation that also nullified Petitioner's deferred
action status. *See id.* at 19 (explaining that an ICE officer's failure to satisfy
both prongs of the INA's warrantless arrest requirements before effecting a
warrantless arrest is an agency action that exceeds "statutory jurisdiction,
authority, or limitations, or [is] short of statutory right") (citing 5 U.S.C. §
706(2)(c)).

The parties do not dispute that Petitioner was arrested without a
warrant. Reddish, whose declaration indicates that Reddish was not present
at the stop, attests that "officers encountered" Petitioner's vehicle, ran its
license plates through a data base, discovered that "the vehicle was registered
to Petitioner[,]" ran "[c]riminal history and immigration checks[,]" and
discovered Petitioner's 2006 identity theft conviction with suspended sentence.
Reddish Decl ¶ 5. Reddish also attests that "[i]mmigration checks indicated

that Petitioner had applied for immigration benefits but no records were found to indicate Petitioner had legal immigration status[,]" and that "ERO determined that there was probable cause that Petitioner was unlawfully present in the United States." *Id*. at ¶ 6. Respondents contend that this determination was sufficient to effect a lawful arrest. Resp. at 12.

Under the INA, an ICE officer has probable cause to arrest only when that officer "has reason to believe" that the individual "is in the United States in violation of [the immigration laws]" *and* "is likely to escape before a warrant can be obtained for his arrest[.]"    8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii))).    "The 'reason to believe' language in § 1357(a)(2) is the equivalent of the constitutional requirement of probable cause." *Ramirez Ovando*, 2025 WL 3293467, at *2

Here, even assuming that the ICE officers met the first probable cause prong, they did not meet the second.    Respondents do not say that they conducted a flight risk assessment.    And they provide no facts or documentation to discern any basis to make such assessment. The statutory requirement "that an immigration officer must have probable cause of flight risk, 'is not mere verbiage.'" *Id*. (quoting *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016) and citing *Arizona v. United States*, 567 U.S. 387, 394 (2012)).    Before effecting a warrantless arrest, ICE officers must make a "particularized inquiry" that the subject is likely to abscond.    *Id*. (quoting *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007–08 (N.D. Ill. 2016));

*see also United States v. Kahn*, 324 F. Supp. 2d 1177, 1186–87 (D. Colo. 2004) (considering defendant's traditional flight risk factors, including ties to the community, in finding that his warrantless arrest violated § 1357(a)(2)); *Pacheco-Alvarez*, 227 F. Supp. 3d at 889–90 (same); *United States v. Bautista-Ramos*, No. 18-CR-4066-LTS, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (same).

Here, the facts support that Petitioner was in fact not a flight risk. Petitioner attests that she gave the officers her keys when they requested that she do so, she told them that she would get out of the car, and that she was not resisting. Respondents attest that they ran her identifying information through an immigration database. They discovered that Petitioner had resided in the U.S since 1992, that she had a work authorization, and that she had grown children who live in the community. All of these facts show long-term ties to the community. Further, Petitioner is in line for a U Visa.[1] In sum, the lack of record evidence together with these facts suggest that the ICE officers made no flight assessment, as the INA requires, and that Petitioner's warrantless arrest and subsequent detention erroneously deprived her of the benefits of her deferred action status.

---

[1] Respondents attest that when they searched the immigration database, they discovered Petitioner's open immigration applications. Respondents do not say whether her U visa determination was one of those open immigration applications.

## CONCLUSION

For the reasons explained above, the Court GRANTS the petition for a writ of habeas corpus, ECF No. 2.  Respondents are ordered to immediately release B.D.A.A. from custody (without ankle monitor), subject to the prior terms and conditions of her bona fide U visa determination and the temporary work authorization that she was granted on January 15, 2024.


It is so ORDERED and DATED this __4th__ day of December 2025.


                    /s/Ann Aiken
                    ANN AIKEN
                    United States District Judge